# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued November 29, 2005          Decided January 10, 2006

No. 04-1145

IDACORP ENERGY L.P.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALIFORNIA INDEPENDENT SYSTEM OPERATOR
CORPORATION, ET AL.,
INTERVENORS

―――

Consolidated with
04-1287, 04-1288

―――

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

―――

*Lawrence G. Acker* argued the cause for petitioner IDACORP Energy L.P. With him on the briefs was *Brett A. Snyder*.

*J. Phillip Jordan* argued the cause for petitioner California Independent System Operator Corporation. With him on the briefs were *Robert V. Zener* and *Anthony J. Ivancovich.*

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Deputy Solicitor. *Dennis Lane*, Former Solicitor, entered an appearance.

*Lawrence G. Acker* and *Brett A. Snyder* were on the brief for intervenor IDACORP Energy L.P. in support of respondent.

*J. Phillip Jordan*, *Robert V. Zener, Anthony J. Ivancovich, Mark D. Patrizio, Stan Berman,* and *Joseph H. Fagan* were on the brief for intervenors California Independent System Operator Corporation and Pacific Gas and Electric Company in support of respondent. *Michael E. Ward* entered an appearance.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Despite daunting technical discussions of neutrality adjustments and megawatt-hours contained in the parties' many briefs, this case is really just a billing dispute between the entity that runs the California electric grid and one of its customers. The Federal Energy Regulatory Commission rejected the customer's claim for a refund, and the customer now argues the biller (1) impermissibly changed its invoice retroactively, and (2) failed to follow the correct methodology for ensuring that certain charges stayed within pre-arranged limits. The biller filed a cross-petition, claiming the Commission (1) improperly interpreted its agreement with the customer, and (2) should have permitted it

to increase the pre-arranged limit on charges. Finding that FERC appropriately rejected the customer's first challenge but seeing merit to the second, we grant in part and deny in part its petition for review. Because the biller has yet to suffer any injury, we are without jurisdiction to address its cross-petition.

**I.**

A non-profit organization, the California Independent System Operator Corporation (CAISO), runs the electric grid for most of California. Petitioner IDACORP is one of several "Scheduling Coordinators" which receives energy from CAISO. CAISO charges Scheduling Coordinators in amounts governed by a tariff on file with the Federal Energy Regulatory Commission (FERC).

The dispute in this case centers on charges imposed during a seven-month period in 2000. Specifically, IDACORP contends that during that period CAISO misapplied a cap contained in tariff section 11.2.9.1:

> The total charges levied under Section 11.2.9 shall not exceed $0.095/MWh [i.e., 9.5 cents per megawatt-hour] . . . unless: (a) [CAISO's] Governing Board reviews the basis for the charges above that level and approves the collection of charges above that level for a defined period; and (b) [CAISO] provides at least seven days' advance notice to Scheduling Coordinators of the determination of [CAISO's] Governing Board.

Tariff section 11.2.9, entitled "Neutrality Adjustments," authorizes CAISO to "levy additional charges or payments as special adjustments" in five categories: (a) amounts needed to round charges up to the nearest whole dollar, (b) penalties levied by CAISO, (c) amounts needed to balance CAISO's accounts at the end of each trading day, (d) payment adjustments, and

(e) awards from good faith negotiations or alternative dispute resolution procedures.

FERC accepted CAISO's contention that its charges had not exceeded the cap. *Cities of Anaheim, Azusa, Banning, Colton and Riverside, Cal. v. CAISO*, 105 F.E.R.C. ¶ 61,021, at 61,179 (2003) ("October 2003 Order"), *reh'g* 102 F.E.R.C. ¶ 61,274 (2003) ("March 2003 Order"), *reh'g* 95 F.E.R.C. ¶ 61,197 (2001) ("May 2001 Order"), *reh'g* 94 F.E.R.C. ¶ 61,268 (2001) ("March 2001 Order"), *reh'g denied*, 106 F.E.R.C. ¶ 61,205 (2004) ("March 2004 Order"). IDACORP petitioned for review, finding fault with two aspects of FERC's ruling: (1) allowing the retroactive exclusion of certain types of charges from the cap, and (2) permitting the application of the cap to the monthly average of charges rather than to each hour's charges independently. We address these claims in turn. For each, we review FERC's decision under the familiar arbitrary and capricious standard, affirming if the Commission "made a reasoned decision" and gave "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Pac. Gas & Elec. v. FERC*, 373 F.3d 1315, 1319 (D.C. Cir. 2004) (internal quotation marks omitted). CAISO filed a conditional cross-petition.

## II.

IDACORP first challenges CAISO's treatment of what are known as "out-of-market" (OOM) purchases. Just as the name implies, OOM purchases are energy purchases from outside the market CAISO administers. CAISO makes such purchases to ensure it can satisfy Scheduling Coordinators' demands for energy when those demands exceed supplies in CAISO's market. CAISO then divides the costs of those purchases among Scheduling Coordinators based on the amount of energy each consumes.

CAISO's tariff allocated most neutrality adjustment charges among Scheduling Coordinators in the same way as OOM purchases, with one important difference: Only neutrality adjustment charges are subject to section 11.2.9.1's cap. CAISO's initial invoices billed the two types of charges together as "neutrality costs." During the course of proceedings challenging CAISO's application of the cap, however, CAISO argued that OOM charges fall outside the cap's reach. FERC agreed, reasoning as follows:

> After careful review of [CAISO's] arguments and related Tariff provisions, we agree with [CAISO's] reasoning that its recovery of OOM dispatch costs is not constrained by Section 11.2.9.1's stated hourly limit of $0.095/MWh. We recognize that [CAISO] included OOM charges in its neutrality adjustment charge billings as a matter of administrative convenience, and that proper application of the neutrality adjustment charge allocation mechanism—*i.e.*, recovery of the costs explicitly stated under Section 11.2.9—does not include OOM dispatch costs. Thus, while we maintain our finding that [CAISO's] recovery of neutrality adjustment charges is limited to $0.095/MWh, we clarify that any other costs assessed under provisions other than Section 11.2.9 are not subject to that limit.

March 2003 Order, 102 F.E.R.C. at 61,849. Accordingly, FERC directed CAISO "to separate all costs recoverable under Section 11.2.9 from all other costs included in the invoiced 'neutrality costs.'" *Id.*

In response, CAISO submitted a "compliance filing," in which it identified the charges properly invoiced under section 11.2.9. Letter from Anthony J. Ivancovich, Senior Regulatory

Counsel, CAISO, et al. to Magalie R. Salas, Secretary, FERC (June 10, 2003) ("Compliance Filing"). CAISO contended, however, that providing further detail about the proper categorization of non-section 11.2.9 charges mistakenly invoiced as neutrality adjustments "would be a purposeless expenditure of time and resources" because it would result in no change in the total amount charged to any Scheduling Coordinator. *Id.* at 6. Because none of the section 11.2.9 charges exceeded the cap, CAISO concluded it owed no refunds. *Id.* at 5. FERC accepted the compliance filing. October 2003 Order, 105 F.E.R.C. at 61,183. After unsuccessfully seeking rehearing on this issue, *see* March 2004 Order, 106 F.E.R.C. ¶ 61,205, IDACORP petitioned for review here.

IDACORP contends that FERC's decision to permit CAISO to amend its invoice and move OOM charges out of the "neutrality adjustment" category amounted to "retroactive ratemaking." As all parties agree, CAISO may not engage in retroactive ratemaking, defined as "imposing a rate increase for [power] already sold." *Pac. Gas & Elec. Co.*, 373 F.3d at 1319 (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981)) (alteration in original). But FERC saw no retroactive ratemaking, explaining that its acceptance of the compliance filing "does not allow [CAISO] to change its rate structure," but instead "requires [CAISO] to correct an invoicing mistake." October 2003 Order, 105 F.E.R.C. at 61,180. We agree.

Because the ban on retroactive ratemaking requires compliance with the filed tariff, we begin with section 11.2.9.1. *See Pac. Gas & Elec.*, 373 F.3d at 1320 (requiring "adequate notice before the approved rate is changed"). Section 11.2.9.1's cap applies only to "[t]he total charges levied under Section 11.2.9." IDACORP nowhere claims that any of the five categories listed in section 11.2.9 encompasses OOM charges. Indeed, as FERC points out—and IDACORP does not

contest—a different tariff provision, section 11.2.4.2.1, covers "[a]ll costs incurred by [CAISO] for [OOM] dispatch instructions."

Put another way, pointing to no "rate increase" CAISO seeks to impose, IDACORP asks us to bind CAISO to its original invoice. Its claim, then, sounds more like retroactive invoicing than retroactive ratemaking. The ban on retroactive ratemaking, however, imposes no obstacle to amending invoices; in fact, the prohibition on retroactive ratemaking may well require an amended invoice if the original invoice deviated from the tariff. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990) (allowing collection of filed rate even after parties had negotiated a lower rate).

IDACORP's complaint that CAISO's compliance filing failed to indicate the basis for non-section 11.2.9 charges lends no support to its retroactive ratemaking claim. Concerns about non-section 11.2.9 charges relate only to the accuracy of the amounts billed, which have remained unchanged since the time of the original invoice. Thus, any non-section 11.2.9 inaccuracy would lead to a garden variety billing dispute, not a claim of retroactive ratemaking.

In short, when CAISO moved OOM charges out of the billing category subject to the cap, it did not engage in retroactive ratemaking, but instead simply brought the invoices in line with the tariff. We will therefore deny this portion of the petition for review.

### III.

This brings us to IDACORP's contention that FERC acted arbitrarily and capriciously in failing to require hourly application of the section 11.2.9.1 cap. Applying the cap hourly would forbid CAISO from charging in excess of 9.5 cents per

megawatt-hour in any individual hour even if it charged less than 9.5 cents per megawatt-hour in other hours. By comparison, applying the cap monthly would permit charges in excess of 9.5 cents per megawatt-hour in some hours so long as the *average* charge per megawatt-hour over the entire month did not exceed 9.5 cents.

FERC ordered CAISO to apply the cap hourly, reasoning that "[t]he provision . . . does not include language indicating that the limit—which, we note, is stated using a 'per megawatt-hour' unit—is not intended for application on an hourly basis." March 2001 Order, 94 F.E.R.C. at 61,934. As the proceedings progressed, FERC adhered to this decision, despite CAISO's repeated insistence that the cap should instead be applied annually. May 2001 Order, 95 F.E.R.C. at 61,687; March 2003 Order, 102 F.E.R.C. at 61,849-50. In the compliance filing FERC ultimately accepted, CAISO purported to apply the cap hourly. It computed the "hourly" charge assessed to each Scheduling Coordinator under section 11.2.9 by computing the total charge for each month and dividing by the number of hours in the month. Compliance Filing at 5. In its compliance filing, CAISO also explained that its "Settlements process requires that the amounts . . . be calculated as of the end of each month, rather than day by day or hour by hour," but provided no further explanation. *Id.* at 2.

FERC initially credited CAISO's explanations: "[CAISO] explains that its calculations were limited by the data available, but demonstrates that they in fact reflect hourly costs." October 2003 Order, 105 F.E.R.C. at 61,179. But backing away from this explanation in its order on rehearing, FERC stated that "IDACORP is correct that the amounts were not calculated on an hour-by-hour basis." March 2004 Order, 106 F.E.R.C. at 61,699. Instead, FERC accepted the compliance filing for different reasons:

> [T]he report demonstrates that the amounts at issue are *de minimis*, and IDACORP has not shown that it has been harmed by [CAISO's] calculating the charges on a monthly, rather than an hour-by-hour, basis. Indeed, IDACORP presents no evidence of any amount for which it is due a refund. Given that the data provided by [CAISO] shows that the amounts at issue were very small (and were actually negative in all months), we find that the administrative burden involved in performing further calculations to comply precisely with our earlier directive in every hour of the seven months at issue, for every Scheduling Coordinator, would be extremely costly while potentially causing substantial delay in both this proceeding and [another pending proceeding involving CAISO] by depleting [CAISO's] limited resources. Therefore, we conclude that any further recalculations of the neutrality adjustment charges are unwarranted.

*Id.* (footnote omitted). In support of its conclusion that the amounts at issue are de minimis, FERC explained: "For example, [CAISO] notes that the amount of costs credited or debited as of the end of June 2000 with regard to the entire market was [negative] $798.11. The amount per Scheduling Coordinator would be a fraction thereof. All other months reflected similarly minimal, negative amounts." *Id.* n.9 (citation omitted).

As IDACORP points out, however, FERC's explanation doesn't follow given that small monthly totals can mask volatility when debits and credits are permitted to offset each other. A simple example illustrates this point: Suppose CAISO on one occasion charged IDACORP $1,000,000, and then on another gave IDACORP a refund of $1,000,798.11. These amounts are hardly de minimis, but the aggregated

total—resulting from subtracting the refund from the charge—would be negative $798.11, just as CAISO found. Were this indeed the case, it would affect IDACORP's bill quite dramatically: The $1,000,000 charge would be lowered to the maximum allowable under the cap while the cap would have no effect on the refund. Perhaps FERC would respond that this case does not involve million-dollar variances reaching far above and falling far below the cap. Its order, however, nowhere makes this point, nor does anything in the record reveal the extent of hourly fluctuations.

At oral argument, CAISO's counsel insisted that the charges at issue are by their very nature de minimis. As he explained, CAISO imposed neutrality adjustment charges only under section 11.2.9(c), which authorizes it to levy charges for "amounts required to reach an accounting trial balance of zero in the course of the Settlement process in the event that the charges calculated as due from [CAISO's] Debtors are lower than payments calculated as due to [CAISO's] Creditors for the same Trading Day," but requires CAISO to make payments "[i]n the event that the charges due from [CAISO's] Debtors are higher than the payments due to [CAISO's] Creditors." According to CAISO's counsel, this subsection functions as a mere "accounting fudge factor." Oral Arg. Tr. 42. If true, this explanation might well support FERC's conclusion that the amounts at issue are de minimis, as it would demonstrate that the low aggregated totals are not masking volatility in individual charges. But because FERC didn't rely on this explanation, we may not consider it. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Accordingly, we will grant this portion of IDACORP's petition and remand to FERC for further proceedings consistent with this opinion.

We hasten to note that nothing in this opinion requires FERC to mandate hourly application of the cap. Instead, we are simply remanding for FERC to reconsider its order. In doing so, FERC should consider whether hourly application may be impractical given that the charges at issue appear to arise at most once each day, coming about only when "the charges calculated as due from [CAISO's] Debtors are lower than payments calculated as due to [CAISO's] Creditors *for the same Trading Day*." Tariff § 11.2.9(c) (emphasis added). Of course, the fact that section 11.2.9.1 limits the dollar amount charged "per megawatt-hour"—FERC apparently relied on this in requiring hourly application of the cap, *see* March 2001 Order, 94 F.E.R.C. at 61,934—in no way suggests that the cap must be applied on an hourly basis. The mere presence of the word "hour" in "megawatt-hour" does not mean that a megawatt-hour must be consumed in a single hour. A megawatt-hour is not a unit of time, but a unit of energy. Indeed, as the Federal *Energy* Regulatory Commission conceded at oral argument, a megawatt-hour can be consumed over any period of time—in ten seconds, ten minutes, a day, or a week.

**IV.**

The additional issues the parties raise need not detain us long. IDACORP challenges FERC's denial of its first motion to intervene, but that denial caused it no prejudice given that FERC eventually permitted IDACORP to participate in the proceedings. Accordingly, we will dismiss this portion of IDACORP's petition for lack of jurisdiction. *See* 16 U.S.C. § 825*l*(b) (granting judicial review only to "[a]ny party . . . aggrieved" by FERC's order).

We also lack jurisdiction over CAISO's cross-petition, in which it challenges FERC's interpretation of the section 11.2.9.1 cap and the Commission's rejection of CAISO's attempt to increase the cap from 9.5 cents to 35 cents per megawatt-hour.

Acknowledging that it was not "aggrieved" by FERC's order, CAISO nonetheless argues that it "will be aggrieved if IDACORP is successful in its challenge to the FERC-ordered separation of the OOM costs and other costs from the neutrality charges." CAISO's Opening Br. 15. But because we have rejected IDACORP's challenge, CAISO remains unaggrieved—a fact unaffected by our grant of another part of IDACORP's petition. CAISO continues to insist that it will owe no refund, claiming that section 11.2.9 charges are small enough to avoid triggering the 9.5 cents per megawatt-hour cap. *See* Oral Arg. Tr. 42 ("This is a tiny item."). Any injury to CAISO is therefore not only conjectural, but believed by CAISO itself to be unlikely to occur. We will therefore dismiss CAISO's cross-petition for lack of jurisdiction. *See Interstate Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 45 (D.C. Cir. 2002) (requiring injury that is "not conjectural or hypothetical" for petitioner to be "aggrieved" (internal quotation marks omitted)). Of course, should CAISO become aggrieved due to some action FERC takes on remand, it may then seek judicial review of the issues raised in its cross-petition.

## V.

Finding no retroactive ratemaking, we deny the portion of IDACORP's petition relating to OOM charges. But because we conclude that FERC's acceptance of CAISO's compliance filing was arbitrary and capricious, we grant IDACORP's petition in part. We dismiss the remainder of IDACORP's petition and the entirety of CAISO's cross-petition, both for lack of jurisdiction.

*So ordered.*